IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 25-CR-00239-GKF |
| | ) |
| KENNEDY ANTONIO RAMIREZ ACOSTA, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter comes before the court on the Motion to Suppress Search [Doc. 27] of defendant Kennedy Antonio Ramirez Acosta. For the reasons set forth below, the motion is denied.

**I.    Background**

On July 8, 2025, a grand jury returned an Indictment charging Mr. Ramirez with one count of Possession of Fentanyl with Intent to Distribute pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi). [Doc. 13]. The charge relates to 901 grams of a purple substance that tested presumptively positive for the presence of Fentanyl Xylazine that was located during a search of a white Ford F-250 bearing Colorado tag no. ECIX56. Trial of this matter is scheduled for September 15, 2025. [Doc. 40].

In advance of trial, Mr. Ramirez filed the motion to suppress seeking to exclude items seized from the Truck. [Doc. 27]. On August 8, 2025, the court held an evidentiary hearing on the motion. [Doc. 41].

**II.    Relevant Facts**

Based on the testimony and evidence presented during the August 8, 2025 evidentiary hearing, the court finds as follows:

On June 11, 2025, Tulsa County Deputy Sheriff Kimber Take was in her patrol vehicle near 33rd West Avenue and Southwest Boulevard. At the time, she was logged into the Flock system. The Flock system is an Automatic License Plate Reader system with cameras that capture photos of vehicles' license plates while the vehicles are operating on public roadways. The cameras are owned by the City of Tulsa, but the City has given the Tulsa County Sheriff's Office permission to utilize the data as a tool for NCIC notifications. A Flock camera is located near 33rd West Avenue and Southwest Boulevard.

At approximately 12:35 p.m., Deputy Take received a "stolen plate identifier" Flock notification related to a Colorado license plate. The Flock notice included a large view of the license plate, a partial view of the vehicle to which the plate was affixed, a map identifying where the camera was located, and the type of National Crime Information Center (NCIC) entry (*i.e.*, stolen tag).[1] The capture occurred two to three minutes prior to the notification. TCSO officers did not get a search warrant for the Flock camera information.

Based on the Flock notice, Deputy Take knew that she was looking for a white Ford F-250 with a black Colorado license plate and the direction that the vehicle was traveling at the time of the capture. Deputy Take logged into the Oklahoma Law Enforcement Telecommunications System (OLETS) and independently ran the Colorado tag number, which confirmed that the plate was stolen.[2] Deputy Take then contacted other TCSO deputies working in her district to let them know that she was going to look in the area for the vehicle.

---

[1] The National Crime Information Center is a program that permits law enforcement across the country to access criminal justice information. Deputy Take testified that NCIC is routinely relied on by law enforcement.

[2] OLETS provides NCIC returns. Deputy Take testified that it is regularly relied upon by law enforcement officers in the State of Oklahoma to obtain criminal justice information.

Within approximately thirty minutes, Deputy Take located the truck parked in the Crystal City Shopping Center parking lot. Deputy Take never saw the truck operating on a public street. While in the parking lot, Deputy Take again confirmed the license plate and observed an individual in the driver's side of truck's cab.

TCSO Deputy Daniel Gulley and TCSO Deputy Daniel Smith subsequently arrived to assist Deputy Take.[3] Neither Deputy Gulley nor Deputy Smith ever saw the truck operating on public roadways.

Deputy Take advised Deputy Gulley that she had confirmed in NCIC that the license plate was stolen. Deputy Take and Deputy Gulley observed the individual in the truck get out of the vehicle, walk around it, open the truck's front hood, and then begin cleaning the vehicle's wheels and tires. Deputy Gulley also observed the individual climb onto the front bumper to see inside the engine compartment.

Deputy Gulley made contact with the individual, identified as Mr. Ramirez. Deputy Gulley told Mr. Ramirez to "step down" and then placed Mr. Ramirez in handcuffs. Deputy Gulley secured Mr. Ramirez in the backseat of his patrol vehicle and then returned to the truck.

After Mr. Ramirez was detained, Deputy Smith opened the truck's driver's side door and obtained the truck's VIN number from a sticker inside the driver's door jam. Deputy Smith and Deputy Take returned to Smith's vehicle and Deputy Smith ran the VIN number through NCIC. NCIC confirmed that the vehicle had been reported as stolen.

Deputy Take informed Deputy Gulley that the VIN confirmed that the truck was stolen. Deputy Gulley then searched the truck's interior. There, Deputy Gulley discovered a backpack that contained a purple substance. Deputy Gulley was advised that fentanyl was now being found

---

[3] Deputy Take had requested backers.

in purple. Underneath the backpack was a large scale. The keys and key fob to operate the truck were also located in the vehicle.

**III.    Analysis**

This matter includes three "searches": (1) use of the Flock system's Automatic License Plate Reader; (2) Deputy Smith opening the truck's driver's side door to obtain the vehicle's VIN number; and (3) Deputy Gulley's search of the truck's interior. Additionally, Mr. Ramirez's person was seized through his arrest.[4] In the briefing, Mr. Ramirez's legal arguments are directed to the first search and his arrest.[5] [Doc. 27; Doc. 34; Doc. 43]. Specifically, Mr. Ramirez argues that TCSO's use of the Automatic License Plate Reader (1) exceeded the scope provided for in Okla. Stat. tit. 47, § 7-606.1, and (2) violated the Fourth Amendment to the U.S. Constitution. The court first considers the searches, both relative to the Fourth Amendment and Okla. Stat. tit. 47, § 7-606.1.

   *A.    Searches and the Fourth Amendment*

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As recently explained by the U.S. Court of Appeals for the Tenth Circuit,

---

[4] In its response, the government initially characterized the detention as an investigative stop supported by reasonable suspicion. However, during the August 8 evidentiary hearing and in the supplemental briefing, the government characterizes the detention as an arrest requiring probable cause. Because the government offers no substantive argument that the detention constituted an investigative stop, rather than an arrest, the court presumes that the detention constituted an arrest. *See Oliver v. Woods,* 209 F.3d 1179, 1186 (10th Cir. 2000) (describing the three types of police/citizen encounters).

[5] Mr. Ramirez seeks to exclude all evidence obtained through the second and third searches as fruit of the poisonous tree. *See United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)) ("In addition, a defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (*i.e.*, evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence.").

"[i]n order to challenge the lawfulness of a search and seizure under the Fourth Amendment, a defendant must first establish his or her standing to do so." *United States v. Guzman*, — F.4th —, 2025 WL 2263950, at *3 (10th Cir. 2025) (quoting *United States v. Marchant,* 55 F.3d 509, 512 (10th Cir. 1995)). "Consequently, 'a threshold issue in deciding a motion to suppress evidence is whether the search at issue violated the rights of the particular defendant who seeks to exclude the evidence.'" *Guzman*, 2025 WL 2263950, at *3 (quoting *United States v. Soto*, 988 F.2d 1548, 1552 (10th Cir. 1993)). The defendant bears the burden to demonstrate standing, which requires both: "(1) [a] subjective expectation of privacy in the property searched, and (2) that society would recognize that expectation of privacy as objectively reasonable." *Marchant,* 55 F.3d at 513 (quoting *United States v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994)).

At the time of the first search, Mr. Ramirez was in possession of the Ford F-250 and its keys. However, mere possession of a vehicle is insufficient for standing. *See United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) ("Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest."). Rather, "the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession" or introduce evidence that he gained lawful possession of the truck from the registered owners. *United States v. Arango,* 912 F.2d 441, 445-46 (10th Cir. 1990). Absent such evidence, no reasonable expectation of privacy exists. *Id.* at 446.; *see also United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) ("Our cases are clear. A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner.").

Mr. Ramirez has offered no evidence that he gained lawful possession of the truck or the license plate from its registered owner(s). Thus, Mr. Ramirez had no reasonable expectation of privacy. *See United States v. Malady,* 209 F. App'x 848, 851 (10th Cir. 2006) (unpublished).[6]

Instead, the evidence demonstrates that both the vehicle and the license plate were stolen. It is well-established that "'a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile.' No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." *Byrd v. United States*, 584 U.S. 395, 409 (2018) (internal citation omitted) (quoting *Rakas v. Illinois,* 439 U.S. 128, 141 (1978)); *see also United States v. Wilfong*, 528 F. App'x 814, 817 (10th Cir. 2013) (unpublished) ("As [defendant] had no privacy interest in the stolen vehicle, he lacked standing to challenge the search."); *Malady,* 209 F. App'x at 851 ("It is well established that a defendant does not have any legitimate expectation of privacy in a stolen vehicle or its contents.").

Mr. Ramirez has offered no evidence that he gained possession of the truck or license plate from the registered owners and therefore he has not met his burden to establish Fourth Amendment standing. Further, because Mr. Ramirez was in a stolen vehicle with a stolen license plate, he had no legitimate expectation of privacy and lacks standing to challenge the searches for this additional reason. Thus, Mr. Ramirez lacks Fourth Amendment standing to challenge the searches related to the Ford F-250, including the use of the ALPR. *See United States v. Davis*, 750 F.3d 1186, 1190 (10th Cir. 2014) ("Because the poisonous tree was planted in someone else's orchard, Mr. [Ramirez] lacks standing to challenge its fruits."). Mr. Ramirez has therefore failed to demonstrate that the searches violated his Fourth Amendment rights. *Arango,* 912 F.2d at 446.

---

[6] "Unpublished decisions are not precedential but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

      B.      *Searches and Okla. Stat. tit. 47, § 7-606.1*

Mr. Ramirez argues that, even if the first search did not violate the Fourth Amendment, the evidence should be suppressed because TCSO's use of the ALPR exceeded the scope of Okla. Stat. tit. 47, § 7-606.1, which provides "[d]ata collected or retained through the use of an automated license plate reader system shall not be used by any individual or agency for purposes other than enforcement of the Compulsory Insurance Law or as otherwise permitted by law." Okla. Stat. tit. 47, § 7-606.1(F).

However, "[i]n determining the reasonableness of a state search or seizure under the Fourth Amendment," the court must "apply federal law." *United States v. Richardson*, 86 F.3d 1537, 1544 (10th Cir. 1996), *abrogated on other grounds as recognized in, United States v. Artez*, 389 F.3d 1106 (10th Cir. 2004)). "The exclusionary rule is only concerned with deterring [federal] Constitutional violations." *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999)); *see also United States v. Price*, 75 F.3d 1440, 1443-44 (10th Cir. 1996) ("The authority in a federal case for suppressing evidence due to an unlawful search is the Fourth Amendment to the Federal Constitution."). "Thus, 'the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.'" *Green*, 178 F.3d at 1105 (quoting *Le,* 173 F.3d at 1264); *see also United States v. Mendoza,* 468 F.3d 1256, 1260 (10th Cir. 2006) (quoting *United States v. Bach,* 310 F.3d 1063, 1066 (8th Cir. 2002)) ("[F]ederal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment."); *United States v. Dickerson*, 195 F.3d 1183, 1186-87 (10th Cir. 1999). As recognized by the Tenth Circuit:

The focus on federal law resists the pull of local impulse, regardless of its direction:

> In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*United States v. Garcia*, 707 F.3d 1190, 1195 n.2 (10th Cir. 2013) (quoting *Elkins v. United States*, 364 U.S. 206 (1960)).

As discussed above, Mr. Ramirez had no reasonable expectation of privacy in the truck or the license plate affixed to same and therefore he has not demonstrated a Fourth Amendment violation.

Moreover, assuming *arguendo* that Mr. Ramirez had standing, the first search did not violate the Fourth Amendment. As previously stated, the evidence demonstrates that a Flock camera, located near 33rd West Avenue and Southwest Boulevard, captured a photo of, and read, a Colorado license plate affixed to a Ford F-250.[7] Within two to three minutes of the capture, without obtaining a warrant for the information, Deputy Take received a "stolen plate identifier" notification from the Flock system related to the Colorado license plate. The notice included a large view of the license plate, a partial view of the vehicle to which the plate was affixed, a map identifying where the camera was located, and the NCIC entry indicating a stolen tag.

As an initial matter, the court notes that no reasonable expectation of privacy existed in either the license plate or the vehicle's movements on public streets. *See United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989) ("[B]ecause they are in plain view, no privacy interest exists in license plates."); *United States v. Matthews*, 615 F.2d 1279 (10th Cir. 1980) (military license place

---

[7] The court notes that Deputy Take testified that the tag had "alerted" earlier that day. However, Deputy Take did not testify that she reviewed the prior Flock notifications.

8

on outside of the car was in plain view and therefore subject to seizure); *United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); *see also United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024) ("[T]he use of a pole camera does not constitute a search if the camera can only capture activity in public view."). Because the Flock capture was limited to the license plate, the vehicle's exterior characteristics, and its location on a public street, all of which were in plain view, no reasonable expectation of privacy existed and the search did not violate the Fourth Amendment.

Nor was the search violative of the Fourth Amendment pursuant to *Carpenter v. United States*, 585 U.S. 296 (2018). In *Carpenter*, the U.S. Supreme Court considered whether "the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements"—specifically, over one hundred days of the defendant's cell-site location information (CSLI) records. *Carpenter,* 585 U.S. at 300. The Court began its analysis by recognizing that the Fourth Amendment "seeks to secure the privacies of life against 'arbitrary power,'" and "that a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Id.* at 305 (internal quotations omitted).

Applying these principles to the CSLI records, the court noted that "[m]aping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts" and "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. These location records hold for many Americans the privacies of life." *Carpenter,* 585 U.S. at 311 (citation modified). Thus, the Court recognized that a person has a "reasonable

expectation of privacy in the whole of his physical movements." *Carpenter,* 585 U.S. at 313. However, the Court noted that its decision was "a narrow one" and explicitly distinguished the data from GPS monitoring of a vehicle because "individuals regularly leave their vehicles, [but] they compulsively carry cell phones with them all the time." *Id.*

The limited use of the Flock camera in this matter is distinguishable from the "all-encompassing record" in *Carpenter* and therefore *Carpenter* is not controlling. First, "the Supreme Court framed *Carpenter* as a narrow decision dependent on the 'unique nature' of historical cell-site location data." *United States v. Sturdivant,* — F. Supp. 3d —, 2025 WL 1633754, at *9 (N.D. Ohio 2025). Further, Mr. Ramirez has submitted no evidence that the Flock camera captures images of persons, nor do the Flock cameras "provide[] an intimate window into a person's life." *Carpenter,* 585 U.S. at 311; *see also United States v. Jackson*, No. 24-CR-10010-JWB, 2025 WL 1530574, at **7-8 (D. Kan. May 29, 2025). And the limited capture at issue in this matter "came nowhere close to capturing 'the whole of [Mr. Ramirez's] physical movements." *Hay,* 95 F.4th at 1316. Rather, the capture was limited to particular moments in time and activity occurring in the public's plain view. *See United States v. Martin*, 753 F. Supp. 3d 454, 475-76 (E.D. Va. 2024) ("[T]hese cameras provide no greater information other than that which is available to the naked eye. . . . [T]he Flock database simply allows for an efficient review of those exterior images and the information they depict.").

Based on the foregoing and under the circumstances of this case, Mr. Ramirez fails to show a Fourth Amendment violation based on the use of the Flock cameras.[8] Because the first search

---

[8] However, the court concurs with U.S. District Judge for the District of Kansas John W. Broomes that the undersigned "can easily see how the more widespread and pervasive deployment of Flock cameras (or cameras connected to the Flock system) could eventually rise to the level of systemic and continuous tracking with which the Supreme Court took issue in *Carpenter*." *Jackson,* 2025 WL 1530574, at *9.

10

complied with the Fourth Amendment, whether it violated state law is irrelevant. Thus, the court need not decide whether the first search violated Okla. Stat. tit. 47, § 7-606.1. Mr. Ramirez's motion must be denied in this regard.

      C.      *The Seizure*

In reply, Mr. Ramirez also challenges his arrest. First, with respect to standing, defendant asserts that he may challenge the use of the ALPR because his arrest was based solely on the information obtained through its use and he has standing to challenge his own arrest. [Doc. 34, p. 2]. Mr. Ramirez relies on *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000), in which the Tenth Circuit acknowledged that it had

> repeatedly recognized that although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.

*Nava-Ramirez,* 210 F.3d at 1131. However, *Nava-Ramirez* is distinguishable as, in that case, the challenged search occurred *after* the arrest. Here, Mr. Ramirez challenges the arrest insofar as it is *premised on* an allegedly illegal search—*i.e.,* the first "search" and information obtained from the ALPR. [Doc. 34, p. 2 ("What is clear is that the deputies had information that was illegally obtained from the ALPR immediately came and arrested my client and then searched the vehicle.")].

For this reason, the Tenth Circuit's decision in *United States v. Arango,* 912 F.2d 441, 445-46 (10th Cir. 1990), rather than *Nava-Ramirez*, is persuasive. In *Arango*, Utah Highway Patrol Troopers effected a traffic stop of defendant Jorge Arango, became suspicious that the vehicle was stolen, and requested Mr. Arango's permission to search the vehicle, which was given. *Arango,* 912 F.2d at 441. Troopers conducted a roadside search of the truck and discovered that modifications had been made to the truck bed. *Id.* at 443. Troopers transported Arango to the

sheriff's office, where the truck was dismantled and officers discovered one-hundred kilograms of cocaine in secret compartments under the truck's bed. *Id*. at 444.

On appeal, the Tenth Circuit concluded that Mr. Arango lacked standing to challenge the initial, roadside search because he had not shown that he was in lawful possession of the vehicle. *Id.* at 445-46. However, the Tenth Circuit concluded that Mr. Arango did have standing to challenge his own arrest. *Id.* at 446. In considering the validity of the arrest, the court relied on evidence obtained during the initial (challenged) search, and, ultimately, concluded that probable cause existed to arrest Mr. Arango. *Id.* at 447. Based on *Arango,* this court concurs with U.S. District Judge for the District of Kansas Holly L. Teeter that "[d]efendant can't do indirectly what he lacks standing to do directly," and therefore Mr. Ramirez's "attempts to challenge his arrest by making indirect arguments on the [first] search" fail. *United States v. Harrison*, No. 23-CR-20068-HLT, 2024 WL 3328585, at *7 (D. Kan. July 8, 2024). Thus, although Mr. Ramirez has standing to challenge his own arrest, he may not do so by attacking the first search.

Insofar as Mr. Ramirez contends that TCSO deputies lacked probable cause to arrest him, the court is not persuaded.

"A warrantless arrest violates the Fourth Amendment unless it was supported by probable cause." *United States v. Johnson,* 43 F.4th 1100, 1107 (10th Cir. 2022) (quoting *United States v. Sanchez*, 13 F.4th 1063, 1072-73 (10th Cir. 2021)). "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Rather, "[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Johnson,* 43 F.4th at 1107 (quoting *Sanchez*, 13 F.4th at 1073). The inquiry is objective and based on the

totality of the circumstances. *See United States v. Valenzuela*, 365 F.3d 892, 896-97 (10th Cir. 2004).

Here, prior to the arrest, Deputy Take received a Flock notification regarding a stolen license plate out of Colorado. Deputy Take subsequently, independently ran the Colorado license plate number through OLETS, which confirmed that the license plate was reported as stolen. Within thirty minutes of receiving the Flock alert, Deputy Take located the vehicle with the stolen plate in the Crystal City parking lot. Upon finding the truck with the stolen license plate in the Crystal City parking lot, Deputy Take confirmed the license plate for a second time. Deputy Take advised Deputy Gulley that she had confirmed the license plate was stolen. Deputy Take and Deputy Gulley then observed an individual, identified as Mr. Ramirez, exit the vehicle, walk around it, begin to clean its tires, and climb onto the bumper to view the engine. Finally, Deputy Take testified that, in her experience, license plates are commonly affixed to vehicles to which they don't belong in order to conceal a stolen vehicle or commit crimes.

Under the circumstances, probable cause existed that Mr. Ramirez violated Okla. Stat. tit. 47, § 4-107, which provides, "[a] person who removes a license plate from a vehicle or affixes to a vehicle a license plate not authorized by law for use on said vehicle with intent to conceal or misrepresent the identity of the vehicle or its owner shall, upon conviction, be guilty of a misdemeanor."[9] Okla. Stat. tit. 47, § 4-107(D). Based on the NCIC report that the license plate was stolen, a reasonable person would believe that the license plate was not authorized by law for use on the vehicle. *See United States v. Hines,* 564 F.2d 925, 927 (10th Cir. 1977) ("[I]nformation received from the NCIC computer bank has been routinely accepted in establishing probable cause

---

[9] Although Deputy Gulley stated that Mr. Ramirez was under arrest for possession of a stolen vehicle, rather than a violation of Okla. Stat. tit. 47, § 4-107, "[b]ecause probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Wesby*, 583 U.S. at 54 n.2.

for a valid arrest."); *Ramirez v. City of Wichita,* 78 F.3d 597, at *3 (10th Cir. 1996) (unpublished table decision); *United States v. Figueroa-Camarillo*, 734 F. Supp. 3d 1196, 1202 n.5 (D.N.M. 2024) (collecting cases). Further, based on Deputy Take's training and experience, as well as Mr. Ramirez's possession of the vehicle, a reasonable person would infer that the license plate was affixed to conceal or misrepresent the identity of the vehicle.[10] *See Figueroa-Camarillo,* 734 F. Supp. 3d at 1203 (stating "law enforcement is not required to be omniscient mind-readers before they effectuate an arrest" as "one's mental state can always be inferred") (citing *United States v. Christy,* 916 F.3d 814, 849 (10th Cir. 2019); *United States v. Brooks,* 67 F.4th 1244 (10th Cir. 2023)).[11]

Likewise, probable cause existed that Mr. Ramirez violated Okla. Stat. tit. 47, § 4-103, which probits unauthorized possession of a vehicle with knowledge that the vehicle is stolen. *See* Okla. Stat. tit. 47, § 4-103(A) ("A person not entitled to the possession of a vehicle who receives, possesses, conceals, sells, or disposes of it, knowing the vehicle to be stolen or converted under circumstances constituting a crime shall, upon conviction, be guilty of a felony."); *see also Henry v. Storey,* 658 F.3d 1235, 1239 (10th Cir. 2011) (probable cause existed that defendant had stolen a vehicle where officers received NCIC hit that license plate was stolen).

Based on the foregoing, Mr. Ramirez has not demonstrated that his arrest violated the Fourth Amendment. Further, insofar as Mr. Ramirez argues that his arrest violated Oklahoma law,

---

[10] Insofar as Deputy Take did not explicitly communicate her training and experience to Deputy Gulley, Deputy Take's knowledge is imputed to Deputy Gulley through the collective knowledge doctrine. *See United States v. Latorre*, 893 F.3d 744, 753-55 (10th Cir. 2018).

[11] In fact, during the August 8 evidentiary hearing, Mr. Ramirez conceded that, if the TCSO deputies had a legal reason to know that the tag was stolen, deputies would have had a legal reason to detain Mr. Ramirez. As discussed above, TCSO lawfully obtained the Flock notification that identified the tag as stolen, and Deputy Take subsequently, independently confirmed same.

any state-law violation is irrelevant to the Fourth Amendment analysis.[12]  *See Green*, 178 F.3d at 1105.  Thus, Mr. Ramirez's motion to dismiss in this regard is denied.

## IV. Conclusion

WHEREFORE, the Motion to Suppress Search [Doc. 27] of defendant Kennedy Antonio Ramirez Acosta is denied.

IT IS SO ORDERED this 22nd day of August, 2025.

*[signature]*
GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

---

[12] During the August 8 evidentiary hearing, Mr. Ramirez raised the additional argument that, if premised on Okla. Stat. tit. 47, § 4-107(D), his arrest violated Okla. Stat. tit. 22, § 196.  Section 196 governs warrantless arrests in the State of Oklahoma and requires that, to be arrested for a misdemeanor, the offense must have been committed in the officer's presence.  However, "the necessity of a warrant to make a misdemeanor arrest for a crime not committed in the presence of an officer is a requirement imposed by statute, and not the federal Constitution" and therefore no Fourth Amendment right is implicated.  *United States v. Battle,* No. CR-15-110-D, 2015 WL 4612662, at *6 (W.D. Okla. July 31, 2015) (quoting *State v. Lee*, 763 P.2d 385, 386 (Okla. Crim. App. 1988)).